CLERK'S OFFICE U.S. DIST. COURT
AT CHARLOTTESVILE, VA
FILED
SEP 30 2013
JULIA C. DUDLEY, CLERK
BY:
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
DANVILLE DIVISION

| | | |
|---|---|---|
| KIMBERLY R. BLACKWELL, | ) | CASE NO. 4:13CV00006 |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | REPORT AND RECOMMENDATION |
| | ) | |
| CAROLYN W. COLVIN,[1] | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | By:  B. Waugh Crigler |
| Defendant. | ) |     U. S. Magistrate Judge |

This challenge to a final decision of the Commissioner which denied plaintiff's November 30, 2009 protectively-filed application for supplemental security income under the Social Security Act ("Act"), as amended, 42 U.S.C. § 1381, et seq., is before this court under authority of 28 U.S.C. § 636(b)(1)(B) to render to the presiding District Judge a report setting forth appropriate findings, conclusions, and recommendations for the disposition of the case. The questions presented are whether the Commissioner's final decision is supported by substantial evidence, or whether there is good cause to remand for further proceedings. 42 U.S.C. § 405(g). For the reasons that follow, the undersigned will RECOMMEND that an Order enter GRANTING, in part, plaintiff's motion for summary judgment, DENYING the Commissioner's motion for summary judgment, and REMANDING this case to the Commissioner for further proceedings.

In a decision dated July 20, 2011, an Administrative Law Judge ("Law Judge") found that plaintiff had not engaged in substantial gainful activity since November 30, 2009, her application

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. (Dkt. No. 15.) Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin hereby is substituted for Michael J. Astrue as the defendant in this action.

date.² (R. 12.) The Law Judge determined plaintiff's borderline intellectual functioning, affective disorder, and posterior tibial tendon insufficiency with pes planus and hindfoot valgus were severe impairments.³ (R. 12.) He determined that plaintiff's back pain was not a severe impairment. (R. 12.) He also concluded that, through the date of the hearing, plaintiff did not suffer an impairment or combination of impairments which met or equaled a listed impairment. (R. 12-14.) Further, the Law Judge found that plaintiff possessed the residual functional capacity ("RFC") to perform a range of light work, with the additional limitations that she can only occasionally climb, balance, and crawl; can never climb ladders, ropes, or scaffolding; and is limited to simple, repetitive work tasks. (R. 14-16.)

In support of his decision, the Law Judge relied on portions of the testimony of Robert Jackson, a vocational expert ("VE"), which were in response to questions premised on the Law Judge's RFC finding. (R. 16-17, 34-36.) He determined that plaintiff had no past relevant work. (R. 16.) However, he also found that there were other jobs in significant numbers in the local and national economy which plaintiff could perform, including as a cleaner and packer. (R. 16-17.) Accordingly, the Law Judge concluded that plaintiff was not disabled. (R. 17.)

Plaintiff appealed the Law Judge's July 20, 2011 decision to the Appeals Council. (R. 1-4.) In its December 18, 2012 notice of action, the Council found no basis to review the Law

---

² Disability is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment or combination of impairments that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382c(a)(3)(A) (2004). Substantial gainful activity is "work activity that involves doing significant physical or mental activities," and it is typically determined by the amount of a claimant's earnings. *See* 20 C.F.R. §§ 404.1572 and 1574. The sequential evaluation is a five step process used by the Commissioner to evaluate whether a claimant is disabled. *See* 20 C.F.R. § 404.1520(a)(4). If a claimant is found not disabled at any level prior to the final level, the inquiry is to stop. *Id.*

³ A severe impairment is any impairment or combination of impairments which significantly limits a claimant's physical or mental ability to do basic work activities. *See* 20 C.F.R. § 404.1520(c).

Judge's decision, denied review, and adopted the Law Judge's decision as the final decision of the Commissioner. (R. 1-3.) This action ensued and briefs were filed.

The Commissioner is charged with evaluating the medical evidence and assessing symptoms, signs, and medical findings to determine the functional capacity of the claimant. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990); *Shively v. Heckler*, 739 F.2d 987 (4th Cir. 1984). The regulations grant some latitude to the Commissioner in resolving conflicts or inconsistencies in the evidence, which the court is to review for clear error or lack of substantial evidentiary support. *Craig v. Chater*, 76 F.3d 585, 589-590 (4th Cir. 1996). In all, if the Commissioner's resolution of the conflicts in the evidence is supported by substantial evidence, the court is to affirm the Commissioner's final decision. *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). Substantial evidence is defined as evidence, "which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than preponderance." *Id.* at 642. When the Appeals Council considers additional evidence offered for the first time on administrative appeal and denies review, courts must consider the record as a whole, including the new evidence, in determining whether the Commissioner's final decision is supported by substantial evidence. *Meyers v. Astrue*, 662 F.3d 700, 707 (4th Cir. 2011); *Wilkins v. Secretary*, 953 F.2d 93, 96 (4th Cir. 1991).

In her brief in support of his motion for summary judgment, plaintiff contends that the Law Judge erred by "dismissing or giving little weight" to the consultative psychological evaluation of licensed clinical psychologist Frank Russell, Ed.D. (Dkt. No. 14, at 4-8.) Essentially, she claims that the Law Judge was "acting as his own medical advisor" in violation of Social Security regulations in rejecting Russell's opinion. *Id.* at 5. She contends that the Law Judge should have ordered another evaluation or provided Dr. Russell with additional evidence

3

and the opportunity to further evaluate plaintiff's mental status. *Id.* at 6. Finally, plaintiff argues that Dr. Russell's findings are consistent with the other record evidence, which together show that plaintiff is disabled. Id. at 6-8.

To say the least, there are remarked inconsistencies in the record concerning the severity of plaintiff's mental impairments. Apart from the two psychological evaluations from November 2008 and May 2010, plaintiff rarely complained of limitations resulting from any mental impairments. From October 2008 through July 2010, there is no evidence that plaintiff sought mental health treatment, that she was prescribed medication for any such impairment, that she complained of any symptoms or limitations, or that she reported a history of a mental impairment. (R. 247, 265-266, 274, 326-327, 349-350, 399, 403, 411.) All mental status findings on the various physical examinations in the record were normal for that period. All indications were that plaintiff was alert and oriented (R. 283, 293, 304, 307, 311, 321, 357, 407), of normal mood and affect (R. 283, 321, 407), displayed no, or only mild, distress (R. 303, 306, 311, 321); presented with appropriate speech rate, tone, and content (R. 293, 407); and was talkative, cooperative, and maintained good eye contact (R. 293, 407).

For the first time in July 2010, plaintiff reported to Robert Goodnight, M.D. of the Free Clinic that she was hearing voices and felt very sad. (R. 420.) Plaintiff's general appearance was reported as pleasant, alert, and oriented. *Id.* She was found to be of appropriate affect, revealed appropriate speech rate, tone, and content; was talkative; and maintained good eye contact. *Id.* Plaintiff was diagnosed with a mood disorder NOS (not otherwise specified) and was prescribed Seroquel and Celexa. *Id.* She was also referred to a psychiatrist, with a note that plaintiff had been in treatment in the past. *Id.*

4

In October 2010 visit to the Free Clinic, plaintiff reported that she had stopped taking Celexa, thinking that it contributed to her liver problem, but she did ask for Seroquel to "stop the voices." (R. 431.) Her treatment was not changed. *Id.* Finally, in November 2010, plaintiff reported various physical complaints, but her mood was "ok," and she was not experiencing auditory or visual hallucinations. (R. 433.) There is no evidence that plaintiff sought any further treatment, or that she complained of any psychological symptoms in either December 2010 or February 2011. (R. 435-441.)

In addition to these treatment records, there are two psychological evaluations. In October 2008, Bede A.R. Pantaze, a licensed clinical psychologist, observed that plaintiff was reserved and uncomfortable in her interactions and "reached her limits early" in activity level but, otherwise, was presenting normal behavior. (R. 250-251.) Pantaze administered the Wechsler Adult Intelligence Scales-WAIS-III. (R. 251.) Plaintiff achieved a Verbal IQ score of 75, performance IQ score of 76, and a Full Scale IQ score of 74, all indicating that she was in the borderline range of intellectual function. (R. 251-255.) On the Wide Range Achievement Test-4, plaintiff read at a third grade level, handled arithmetic concepts at a fifth grade level, and could spell words at a high school level. (R. 251, 255.) She also displayed anxiety, insecurity, and confusion during the "Draw-A-Person" and "Bender Visual Motor Gestalt" tests. (R. 251, 255-256.) Pantaze diagnosed plaintiff as suffering an adjustment disorder with anxiety and borderline intellectual functioning, with additional educational and occupational "problems." (R. 257.) She assigned a plaintiff a Global Assessment of Functioning score of 60-70, which signified moderate to mild symptoms and difficulties in social, school, and occupational functioning.[4] *Id.* She also opined that plaintiff would function best in unskilled or semi-skilled

---

[4] *See* American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders: DSM–IV–TR 34 (4th ed., text revision 2000).

occupations involving concrete and relatively repetitive tasks. (R. 255.) Furthermore, Pantaze opined that plaintiff would require constant supervision to be able to start, complete, and then move on to other tasks, that she could not function independently, that she had difficulties interpreting and responding to the behavior/communication of others, often failed to pick up social cues, and was limited in verbal and written communication areas. (R. 257.)

In May 2010, Dr. Russell seems to have encountered a different person from the one who had been seen by Pantaze two years earlier. Dr. Russell struggled to get plaintiff to interact with him and ultimately relied on her friend, Melinda Luck, to provide most of the historical information contained in his report. (R. 364-365.) He noted that plaintiff appeared confused, gazing about the room without making eye contact and taking long pauses before answering questions. (R. 364-365.) Ms. Luck reported that plaintiff had an extensive mental health treatment history from Florida, including numerous hospitalizations at psychiatric facilities, but she also revealed that plaintiff currently was not taking any psychotropic medication. (R. 366.) Plaintiff and Ms. Luck revealed that plaintiff frequently would talk to herself as if "there is someone in the room having a conversation with her," and Dr. Russell noted that plaintiff demonstrated this behavior on examination. (R. 366.) Luck also stated that only animals would calm plaintiff down, and that plaintiff would adopt a caretaking role around them, but that she otherwise was in "her own world." (R. 367.) Plaintiff lived alone without difficulty, though Luck helped with shopping and cleaning, cooking, and was with plaintiff "all the time." (R. 366.)

A mental status examination showed the following: plaintiff was uncooperative, she was unable to respond to questions in a coherent manner, she was impatient and restless, almost immediately asking to terminate the interview though staying after a little redirection and

encouragement; she provided no eye contact; and she stared off into space while rubbing her finger and thumb together and talking to herself. (R. 367.) Plaintiff presented a full range affect and a stable mood, and she did not interact with the examiner in any significant way and, mostly, was compliant with whatever Luck said. (R. 367.) While she knew her first and last name, she was not oriented by date or day of the week. *Id.* Plaintiff was unable to respond to any of the question which is typically presented in a mental status evaluation, unable to do the Digit Span subtest, or respond to question regarding recent and remote memory, etc. *Id.*

Dr. Russell reviewed the Pantaze's test results, but he noted that plaintiff was not able to concentrate or focus long enough for him to repeat the tests for his evaluation. (R. 367.) When he inquired of Luck about differences in plaintiff's behavior between the two assessments, Luck commented that plaintiff was not like this all the time, and that she "goes in and out." (R. 368.) Luck was unable to provide any further information, and Dr. Russell noted that plaintiff had interacted appropriately with Pantaze without difficulties in behavior or socialization and without any indication that she was on medication at the time. (R. 368.)

Dr. Russell concluded that plaintiff would not be able to perform any type of tasks, maintain attendance in a work place, or perform work activities on a consistent basis. (R. 368.) He also noted that plaintiff would need significant supervision to complete any task at all, would not be able to interact with the public or with coworkers, but she would accept, though not understand, instructions from supervisors. *Id.* Dr. Russell reported that he rarely saw individuals for a disability evaluation who were actively psychotic, and he was "suspicious that a person who is as floridly psychotic as Ms. Blackwell appeared to be during the evaluation" was not receiving medication or mental health services. *Id.* He was "confused about the discrepancy" between plaintiffs's behavior during her 2008 evaluation with Pantaze, believing it

7

suggested an individual who was floridly psychotic, and who had decompensated significantly over the years. *Id.* He recommended that additional information would be useful to aid in diagnosing and conceptualizing plaintiff's impairments, including records of her hospitalizations in Florida. He also revealed that, "One has to consider the possibility that [plaintiff] is malingering and that Ms. Luck was assisting her." (R. 368.) Russell, however, ruled out malingering and undifferentiated schizophrenia, and he diagnosed plaintiff with borderline intellectual functioning and assigned her a Global Assessment of Functioning ("GAF") score range of 60-35, which indicated either moderate symptoms or difficulties related, or some impairment in reality testing or communication or a major impairment in several functional areas.[5] (R. 368-369.)

The Law Judge addressed both evaluations, along with the rest of the medical evidence. (R. 14-16.) He gave significant weight to "the global assessments of functioning of 60-70...since they are supported by the limited clinical findings and treatment history," and to the opinion of the State agency psychological consultant who opined that plaintiff was capable of simple, unskilled, non-stressful work. (R. 16.) However, he accorded little weight to Dr. Russell's GAF score of 35 on the ground that Russell found plaintiff's behavior suspicious. (R. 16.) The Law Judge concluded that plaintiff's presentation to Russell also was inconsistent with the record as a whole. *Id.*

But for what the undersigned will address later, there are some aspects of the Law Judge's decision to give Dr. Russell's opinion little weight which could be argued as supported by substantial evidence. First, neither Dr. Russell nor Pantaze were treating physicians, and so the opinions of neither would be entitled to controlling weight. *See* 20 C.F.R. § 404.1527(c)(2).

---

[5] *See* American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders: DSM–IV–TR 34 (4th ed., text revision 2000).

Second, Dr. Russell's findings are far more severe than any other examining evidence over the same period, which noted no abnormal findings. For example, examinations in January, July, October, November, and December 2010 revealed that plaintiff was alert and oriented, with appropriate affect, demonstrated appropriate speech rate, tone, and content; was talkative, and that she maintained good eye contact. (R. 407-408, 420, 431-436.) Plaintiff revealed no mental health symptoms or history of problems to her treatment providers prior to July 2010, and the record does not reflect that she received any mental health treatment before that date. (R. 420.)[6] She also denied having any auditory or visual hallucinations in November 2010 (R. 433), after receiving medication, and did not complain of any psychological difficulties to Robert Goodnight, M.D., despite appearing floridly psychotic to Dr. Russell in the same month. (R. 399.) Moreover, Dr. Russell, himself, expressed doubts over whether plaintiff was credible. He noted her lack of mental health treatment, the vast difference between his evaluation and that of 2008, and he noted the potential that plaintiff was malingering, though he wanted to gather additional information to accurately diagnose her. (R. 368.) He also only diagnosed plaintiff with "rule-out" schizophrenia and gave her a wide GAF score range, further demonstrating his uncertainty over the authenticity of plaintiff's allegations. (R. 368-369.)

Opinions of examining physicians which are inconsistent with other record evidence generally are entitled to little weight, and the Law Judge's findings concerning the weight given to evidence and the resolution of inconsistencies in the record will be affirmed if they are incompliance with the regulations and supported by substantial evidence. *See Craig v. Chater*, 76 F.3d 585, 589–590 (4th Cir. 1996); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir.1990). Here, on the evidence before him, the Law Judge does not appear to have acted as his "own

---

[6] There was some evidence that she had been treated for mental health conditions in Florida, which was information Russell thought would be helpful to a diagnosis. (R. 368.)

9

medical advisor." Instead, he could be viewed as grounding his findings in the medical evidence of record, the inconsistencies between the treating and one-time examining reports, and Dr. Russell's own doubts about the veracity of what was being reported to him by plaintiff and Ms. Luck.

Notwithstanding, plaintiff has raised a critical issue over whether the Law Judge failed to adequately develop the record in light of Dr. Russell's clear indication that additional information was needed to adequately assess plaintiff's mental status. (Dkt. No. 14, at 6.) In that regard, a Law Judge, "has a duty to explore all relevant facts and inquire into the issues necessary for adequate development of the record, and cannot rely only on the evidence submitted by the claimant when that evidence is inadequate." *Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986). The courts and the regulations have granted some discretion to the Law Judge over whether a consultative examination is necessary, but such an examination is required when the evidence as a whole is insufficient to support a decision. 20 C.F.R. § 404.1513; *See Bishop v. Barnhart*, 78 Fed. Appx. 265, 268 (4th Cir. 2003) (unpublished). By the same token, the Law Judge may not act as plaintiff's counsel, and plaintiff bears the burden of proof at Steps 1 through 4 of the sequential evaluation and of establishing a prima facie entitlement to benefits. *See Bowen v. Yuckert*, 482 U.S. 137, 147 fn5 (1987); *Hall v. Harris*, 658 F.2d 260, 264-265 (4th Cir. 1981).

The undersigned has concerns about the Law Judge's decision not to order additional evidence concerning plaintiff's mental status. Dr. Russell and Pantaze present compelling evidence that raises questions about the nature and extent of plaintiff's psychiatric condition. Both are the only examining mental health specialists of record and their findings stand in stark contrast with what the other doctors observed. Dr. Russell also specifically requested additional

information to accurately assess plaintiff's condition, including supposedly extensive mental health records. It is the undersigned's view that, based on the circumstances in this record, the Law Judge abused his discretion in not seeking additional evidence which would either confirm or dispel the presence of a serious, if not disabling, mental impairment. It not only could explain any discrepancies in the medical record, but the evidence would go a long way in helping the fact finder, and then a reviewing court, discern whether the lay testimony was worthy of credit. Accordingly, the undersigned finds that the Law Judge failed to adequately develop the record, and that good cause exists to remand the case for further proceedings.

There also are other reasons which are good cause to remand. As said, the Law Judge gave significant weight to findings of the October 2008 evaluation, specifically to the 60-70 GAF score. (R. 16.) From this opinion, and the other medical evidence, the Law Judge included in his RFC determination that plaintiff retained the mental capacity for simple, repetitive work tasks. (R. 14.) However, this finding is not entirely consistent with that evaluation. Though Pantaze opined that plaintiff would be able to perform unskilled or semi-skilled simple, repetitive tasks and had a GAF of 60-70, she also opined that plaintiff would need some to constant supervision to be able to start and complete tasks. (R. 255-257.) Though this evidence concerns a period more than a year before plaintiff's application date, the Law Judge heavily relied on Pantaze's evaluation, citing her test results and finding that plaintiff's suffered borderline intellectual functioning. (R. 12-16.) However, he ignored her finding that plaintiff required supervision, and he did not include it in any hypotheticals asked to the VE. (R. 12-16, 34-36.) Furthermore, the State agency psychological consultant, whose opinion the Law Judge also relied upon in making his RFC determination and in questioning of the VE, did not specifically consider Pantaze's opinion. (R. 167-178.)

The Law Judge is not permitted to "cherry pick" the evidence to support his findings. By only addressing parts of Pantaze's opinion which supported his conclusions and not providing any specific basis for rejecting her conclusion that plaintiff would require supervision, the Law Judge did not sufficiently supported his findings. Instead, he presented rather skewed evidence to the VE, as a result of which the VE's testimony was less than relevant, and the Law Judge's ultimate decision is not supported by substantial evidence. Accordingly, good cause exists to remand on this point as well.

For all these reasons, it is RECOMMENDED that an Order enter GRANTING, in part, plaintiff's motion for summary judgment, DENYING the Commissioner's motion for summary judgment, and REMANDING this case to the Commissioner for further proceedings.

The Clerk is directed to immediately transmit the record in this case to the presiding United States District Judge. Both sides are reminded that pursuant to Rule 72(b), they are entitled to note objections, if any they may have, to this Report and Recommendation within fourteen (14) days hereof. Any adjudication of fact or conclusion of law rendered herein by the undersigned not specifically objected to within the period prescribed by law may become conclusive upon the parties. Failure to file specific objections pursuant to 28 U.S.C. § 636(b)(1)(C) as to factual recitations or findings as well as to the conclusions reached by the undersigned may be construed by any reviewing court as a waiver of such objection. The Clerk is directed to transmit a certified copy of this Report and Recommendation to all counsel of record.

ENTERED: /s/ _____
U.S. Magistrate Judge

Date: Sept. 30, 2013